******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* DARRELL TINSLEY
## (AC 41975)

DiPentima, C. J., and Bright and Devlin, Js.

*Syllabus*

The defendant, who previously had been convicted of the crimes of manslaughter in the first degree and risk of injury to a child, appealed to this court from the judgment of the trial court denying his motion to correct an illegal sentence. The defendant claimed that the trial court improperly concluded that his conviction did not violate the constitutional guarantee against double jeopardy because the defendant failed to demonstrate that both offenses occurred during the same transaction and the crime of risk of injury to a child was not a lesser included offense of manslaughter in the first degree as charged. *Held* that the trial court improperly denied the defendant's motion to correct an illegal sentence because his right to be free from double jeopardy was violated, the offenses of manslaughter in the first degree and risk of injury to a child arose from the same act or transaction, the long form information having alleged that both crimes occurred on the same day, at the same location, and were perpetrated on the same victim, all of the victim's wounds were recent, were inflicted in the same short period of time, and occurred not long before the victim's death, including the fatal laceration to the victim's liver, and the state's theory of the case, presented during trial and its closing argument, was that the defendant inflicted multiple blows to the head, chest and abdomen of the victim over a short period of time, in a single, continuous attack; moreover, the offenses of manslaughter in the first degree and risk of injury to a child constituted the same offense, as risk of injury to a child was a lesser included offense of manslaughter in the first degree as charged because it was not possible for the defendant to have committed manslaughter in the first degree as charged by causing the death of the victim by blunt trauma to the abdomen without also impairing the health of the victim by inflicting trauma to his abdomen, as charged in the risk of injury to a child offense; furthermore, there was no authority that would support a conclusion that the legislature intended to specifically authorize multiple punishments under the statutes in question.

Argued December 3, 2019—officially released May 12, 2020

*Procedural History*

Information charging the defendant with the crimes of capital felony and risk of injury to a child, brought to the Superior Court in the judicial district of Hartford and tried to the jury before *Barry, J.*; verdict and judgment of guilty of manslaughter in the first degree and risk of injury to a child, from which the defendant appealed to this court, *Lavery, C.J., and Shaller and Zarella, Js.*, which affirmed the judgment of the trial court; thereafter, the trial court, *Schuman, J.*, denied the defendant's motion to correct an illegal sentence, and the defendant appealed to this court. *Reversed; further proceedings.*

*Naomi T. Fetterman*, for the appellant (defendant).

*Melissa L. Streeto*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *John F. Fahey*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

DiPENTIMA, C. J. The defendant, Darrell Tinsley, appeals from the judgment of the trial court denying his motion to correct an illegal sentence. On appeal, the defendant claims that the court erred in denying his motion to correct because his conviction for manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (1)[1] and risk of injury to a child in violation of General Statutes (Rev. to 1995) § 53-21,[2] as amended by No. 95-142 of the 1995 Public Acts, violated the constitutional prohibition against double jeopardy. We agree with the defendant and, therefore, reverse the judgment of the trial court.

In affirming the defendant's conviction on direct appeal, we concluded that the jury reasonably could have found the following facts. "[T]he victim's mother, and the defendant met at an office building in downtown Hartford, where they worked as security personnel. Although the defendant and [the victim's mother] had an unstable relationship, they cohabited in a one bedroom apartment along with the [fifteen month old] victim . . . . During the course of the adults' relationship, individuals who knew the victim noticed a marked change in his behavior when he was in the presence of the defendant. At such times, the victim was timid, withdrawn and afraid of the defendant. The defendant's attitude toward the victim ranged from indifference to dislike. When [the victim's mother] was no longer able to avail herself of professional child care, the defendant sometimes took care of the victim while [the victim's mother] worked.

"Prior to his death, the victim was in good health. On December 8, 1996, between 8 a.m. and 8:30 a.m., the defendant drove [the victim's mother] to her place of employment. According to [the victim's mother], there was nothing wrong with the victim when she went to work. During the morning, [the victim's mother] and the defendant spoke by telephone several times concerning the victim. At approximately 11:15 a.m., the defendant telephoned [the victim's mother], stating that there was something wrong with the victim and that he did not know what was the matter. The defendant then drove the victim to [the victim's mother's] place of employment, and from there all three proceeded to the Connecticut Children's Medical Center (medical center) in Hartford. They were involved in a motor vehicle accident en route.

"When he arrived at the medical center, the victim was in critical condition because he was not breathing and had little heart activity. The victim died when resuscitation efforts failed. An autopsy revealed bruises on the victim's right cheek, left leg and chest, which an associate medical examiner from the [O]ffice of the [C]hief [M]edical [E]xaminer determined occurred

shortly before the victim's death. The injuries were inconsistent with an automobile accident, a twelve inch fall into a bathtub, cardiopulmonary resuscitation or bumping into a fire door, which were explanations offered by the defendant. The victim also suffered significant internal injuries, namely, multiple fresh cranial hemorrhages, a broken rib and a lacerated liver that caused three quarters of his blood to enter his abdominal cavity. According to the associate medical examiner, the victim's liver was lacerated by blunt trauma that occurred within [one] hour of death and was the cause of death.

"After the victim died, the defendant was taken to the police station, where he gave a statement and repeatedly denied injuring the victim. The police inspected the apartment where the defendant and victim were alone prior to the victim's death. They found vomit and feces on the victim's clothes, a bedspread and the floor. The victim's blood was found on the bathroom door. When he was informed of the autopsy results, the defendant insisted that the doctors were wrong, a position he maintained throughout trial." *State v. Tinsley*, 59 Conn. App. 4, 6–7, 755 A.2d 368, cert. denied, 254 Conn. 938, 761 A.2d 765 (2000).

The state charged the defendant with capital felony in violation of General Statutes (Rev. 1995) § 53a-54b (9), as amended by No. 95-16 of the 1995 Public Acts,[3] and risk of injury to a child in violation of § 53-21. The jury found the defendant guilty of the lesser included offense of manslaughter in the first degree in violation of § 53a-55 (a) (1)[4] and risk of injury to a child. On February 6, 1998, the court sentenced the defendant to twenty years of incarceration on the manslaughter count and ten years of incarceration on the risk of injury count with the sentences to run consecutively.

On August 14, 2017, the self-represented defendant filed a motion to correct an illegal sentence pursuant to Practice Book § 43-22.[5] The defendant alleged that his sentence violated his federal and state constitutional rights to be free from double jeopardy. On March 8, 2018, the defendant, now represented by counsel, filed a second motion to correct an illegal sentence and an accompanying memorandum of law, reasserting his double jeopardy claim. The state filed its memorandum in opposition on March 26, 2018, and the court, *Schuman, J.*, held a hearing on April 12, 2018. Pursuant to the court's order, the parties submitted supplemental memoranda.

On May 15, 2018, the court issued its memorandum of decision denying the defendant's motion to correct an illegal sentence. At the outset of its analysis, the court observed that the double jeopardy clause protects against multiple punishments for the same offense. It then stated: "In determining whether a defendant has been placed in double jeopardy under the multiple pun-

ishments prong, the court applies a two step process. First, the charges must arise out of the same act or transaction. Second, it must be determined whether the charged crimes are the same offense. Multiple punishments are forbidden only if both conditions are met." (Internal quotation marks omitted.)

With respect to the first step of the analysis, the court noted that the homicide and risk of injury charges involved the same time, place and victim. The homicide count charged that the victim's death had resulted from blunt force trauma to the abdomen, whereas the risk of injury count alleged that the defendant had inflicted multiple traumas to the face, head, chest and abdomen, which caused the laceration of the liver, internal bleeding in the abdomen, a fracture of the tenth rib, and multiple contusions of the face, head, chest and abdomen. The court also observed that the laceration of the liver occurred within one hour of death while the bruises on the victim's cheek, leg and chest occurred shortly before death. "While it is possible that all of these injuries occurred at the same time, it is not certain. Based on the Appellate Court's recital of the facts, it is also possible that the bruising to the cheek, leg, and chest took place at a different time in the morning from the lethal trauma to the liver. It is simply speculative to conclude, based on the existing record, that . . . the victim here incurred injuries in one continuous, uninterrupted assault occurring in a matter of a few minutes." (Citation omitted; internal quotation marks omitted.)

As an alternative and additional analysis, the court also considered whether the crimes of manslaughter in the first degree and risk of injury constituted the same offense. The court specifically identified the issue as "whether risk of injury as charged was a lesser included offense of manslaughter in the first degree as charged. Stated differently, the issue is whether it was possible to commit manslaughter in the first degree in the manner charged without necessarily committing risk of injury as charged." The court concluded that such a possibility existed. It explained that the jury could have found that the defendant violated the risk of injury statute as a result of striking the victim in the face, leg or chest. For these reasons, the court denied the defendant's motion to correct an illegal sentence.

On June 4, 2018, the defendant filed a motion to reargue and for reconsideration. The defendant claimed, inter alia, that the parties should be afforded the opportunity to address (1) our Supreme Court's decision in *State* v. *Porter*, 328 Conn. 648, 182 A.3d 625 (2018),[6] which had been released after the hearing on the defendant's motion to correct an illegal sentence and (2) the evidence underlying the recital of facts by this court in the defendant's direct appeal. See *State* v. *Tinsley*, supra, 59 Conn. App. 6–7. On June 19, 2018,

the court granted the defendant's motion to reargue.

The court held a hearing on July 5, 2018. After hearing from the parties, the court denied the relief requested by the defendant. It maintained its conclusion that the defendant had failed to meet his burden of demonstrating that both offenses occurred during the same transaction. Specifically, the court stated: "It still seems to me entirely possible that the fatal blows to the ribs, liver, and abdomen could have occurred from a separate blow that was interrupted perhaps by a minute or so before or after trauma was inflicted to the child's face and head, which is also alleged in the information. And in that situation it would not clearly be one continuous uninterrupted assault. I acknowledge the defense argument that there's no way to actually parse through all this at this time twenty years later, but ultimately it's the defendant's burden and if we can't do that then the defendant has not met his burden." This appeal followed. Additional facts will be set forth as necessary.

On appeal, the defendant claims that the court improperly denied his motion to correct an illegal sentence. Specifically, he argues that his conviction and punishment for manslaughter in the first degree and risk of injury arose from the same transaction and that risk of injury is a lesser included offense of manslaughter in the first degree, as charged in this matter, in violation of his right to be free from double jeopardy. The state disagrees with both of these arguments. We conclude that under the facts and circumstances of the present case, the defendant's right to be free from double jeopardy was violated. Accordingly, the trial court improperly denied the defendant's motion to correct an illegal sentence.

We begin by reviewing the relevant legal principles pertaining to a motion to correct an illegal sentence, the applicable standard of review and our double jeopardy jurisprudence. A motion to correct an illegal sentence filed pursuant to Practice Book § 43-22 "constitutes a narrow exception to the general rule that, once a defendant's sentence has begun, the authority of the sentencing court to modify that sentence terminates." (Internal quotation marks omitted.) *State* v. *Brown*, 192 Conn. App. 147, 151, 217 A.3d 690 (2019); see also *State* v. *Evans*, 329 Conn. 770, 778–79, 189 A.3d 1184 (2018), cert. denied,      U.S.     , 139 S. Ct. 1304, 203 L. Ed. 2d 425 (2019); see generally *State* v. *Cator*, 256 Conn. 785, 803–804, 781 A.2d 285 (2001) (both trial and appellate courts have power to correct illegal sentence at any time). A sentence that violates a defendant's right against double jeopardy falls within the recognized definition of an illegal sentence. See *State* v. *Parker*, 295 Conn. 825, 839, 992 A.2d 1103 (2010); see also *State* v. *Cator*, supra, 804 (sentence that punished defendant twice for same action violated prohibition against double jeopardy and, thus, was illegal and trial court had

jurisdiction to correct sentence pursuant to § 43-22); *State* v. *Adams*, 186 Conn. App. 84, 87, 198 A.3d 691 (2018) (alleged double jeopardy violation constituted proper basis for motion to correct illegal sentence).

Next, we set forth our standard of review. "Ordinarily, a claim that the trial court improperly denied a defendant's motion to correct an illegal sentence is reviewed pursuant to the abuse of discretion standard. . . . A double jeopardy claim, however, presents a question of law, over which our review is plenary." (Internal quotation marks omitted.) *State* v. *Bennett*, 187 Conn. App. 847, 851, 204 A.3d 49, cert. denied, 331 Conn. 924, 206 A.3d 765 (2019); see also *State* v. *Wade*, 178 Conn. App. 459, 466, 175 A.3d 1284 (2017), cert. denied, 327 Conn. 1002, 176 A.3d 1194 (2018).

We turn to the relevant principles regarding the protection against double jeopardy. The double jeopardy clause of the fifth amendment[7] prohibits both multiple trials for the same offense and multiple punishments for the same offense in a single trial. See *State* v. *Bennett*, supra, 187 Conn. App. 852; see also *State* v. *Chicano*, 216 Conn. 699, 706, 584 A.2d 425 (1990) (overruled in part on other grounds by *State* v. *Polanco*, 308 Conn. 242, 261, 61 A.3d 1054 (2013)), cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 162 (1991). The present case concerns the latter prohibition. Simply stated, "[w]ith respect to cumulative sentences imposed in a single trial, the [d]ouble [j]eopardy [c]lause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended. *Missouri* v. *Hunter*, 459 U.S. 359, 366, 103 S. Ct. 673, 74 L. Ed. 2d 535 (1983) . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Ferguson*, 260 Conn. 339, 361, 796 A.2d 1118 (2002).

"Double jeopardy analysis in the context of a single trial is a [two step] process. First, the charges must arise out of the same act or transaction. Second, it must be determined whether the charged crimes are the same offense. Multiple punishments are forbidden only if both conditions are met." (Internal quotation marks omitted.) *State* v. *Bennett*, supra, 187 Conn. App. 852. "At step one, it is not uncommon that we look to the evidence at trial and to the state's theory of the case . . . in addition to the information against the defendant, as amplified by the bill of particulars. . . . If it is determined that the charges arise out of the same act or transaction, then the court proceeds to step two, where it must be determined whether the charged crimes are the same offense. . . . At this second step, we [t]raditionally . . . have applied the *Blockburger* test [see *Blockburger* v. *United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932)] to determine whether two statutes criminalize the same offense, thus placing a defendant prosecuted under both statutes in double jeopardy: [W]here the same act or transaction consti-

tutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not. . . . In applying the *Blockburger* test, we look only to the information and bill of particulars—as opposed to the evidence presented at trial . . . . Because double jeopardy attaches only if both steps are satisfied . . . a determination that the offenses did not stem from the same act or transaction renders analysis under the second step unnecessary." (Footnote omitted; internal quotation marks omitted.) *State* v. *Jarmon*, 195 Conn. App. 262, 282–83, 224 A.3d 163, cert. denied, 334 Conn. 925, 223 A.3d 379 (2020); see also *State* v. *Porter*, supra, 328 Conn. 662.

For purposes of double jeopardy analysis, a greater included offense and a lesser included offense constitute the same offense. See, e.g., *State* v. *Miranda*, 260 Conn. 93, 125, 794 A.2d 506, cert. denied, 537 U.S. 902, 123 S. Ct. 224, 154 L. Ed. 2d 175 (2002); see also *State* v. *Goldson*, 178 Conn. 422, 425, 423 A.2d 114 (1979) ("[i]t is clear, as *Brown* v. *Ohio*, [432 U.S. 161, 168, 97 S. Ct. 2221, 53 L. Ed. 2d 187 (1977)] holds, that if the two counts stand in the relationship of greater and lesser included offenses, then [t]he greater offense is . . . by definition the same for purposes of double jeopardy as any lesser offense included in it" (internal quotation marks omitted)). Simply stated, "[t]he double jeopardy prohibition . . . is violated if one crime is a lesser included offense of the other." *State* v. *Carlos P.*, 171 Conn. App. 530, 537–38, 157 A.3d 723, cert. denied, 325 Conn. 912, 158 A.3d 321 (2017).

Where the defendant claims that his or her conviction includes a lesser included offense, we employ a different analysis than the traditional *Blockburger* comparison of the elements of each offense. Id., 537–39; see, e.g., *State* v. *Greco*, 216 Conn. 282, 292, 579 A.2d 84 (1990); *State* v. *Raymond*, 30 Conn. App. 606, 610–11, 621 A.2d 755 (1993). "The test for determining whether one violation is a lesser included offense in another violation is whether it is possible to commit the greater offense, in the manner described in the information or bill of particulars, without having first committed the lesser. If it is possible, then the lesser violation is not an included crime. . . . In conducting this inquiry, we look only to the relevant statutes, the information, and the bill of particulars, not to the evidence presented at trial." (Citation omitted; internal quotation marks omitted.) *State* v. *Miranda*, supra, 260 Conn. 125; see also *State* v. *Greco*, supra, 216 Conn. 291; *State* v. *Goldson*, supra, 178 Conn. 426; *State* v. *Bumgarner-Ramos*, 187 Conn. App. 725, 749, 203 A.3d 619, cert. denied, 331 Conn. 910, 203 A.3d 570 (2019); *State* v. *Flynn*, 14 Conn. App. 10, 17–18, 539 A.2d 1005, cert. denied, 488 U.S. 891, 109 S. Ct. 226, 102 L. Ed. 2d 217 (1988). Guided by these principles, we turn to the specifics of the pres-

ent case.

The following additional facts will facilitate our analysis of the defendant's appeal. In count one of the long form information dated November 24, 1997, the state charged the defendant with "capital felony, in violation of . . . § 53a-54b (9)" and alleged that "on or about the morning of December 8, 1996 . . . the defendant, with the intent to cause the death of [the victim] caused the death of [the victim] who was then fifteen (15) months of age, by blunt trauma to the abdomen." In count two of the information, the state charged the defendant with "violation of . . . § 53-21," risk of injury to a child, and alleged that "on or about the morning of December 8, 1996 . . . the defendant did an act likely to impair the health of [the victim] who was then fifteen (15) months of age, by inflicting multiple trauma to his face, head, chest, and abdomen and thereby causing: laceration of the liver, internal bleeding in the abdomen, fracture of the tenth right rib, and multiple contusions of the face, head, chest, and abdomen."

On December 11, 1997, the court, *Barry, J.*, instructed the jury following the presentation of evidence and closing arguments in the defendant's criminal trial. The court charged the jury regarding the crime of capital felony. It then instructed the jury on the crime of manslaughter in the first degree in violation of § 53a-55 (a) (1),[8] as well as other lesser included offenses of capital felony.[9] The jury found the defendant guilty of manslaughter in the first degree, as a lesser included offense of capital felony, and risk of injury to a child. The court sentenced the defendant to twenty years of incarceration on the manslaughter count and a ten year consecutive sentence on the risk of injury count.

Step one of our double jeopardy analysis involves the determination of whether the two offenses arose from a single act or transaction. "Under step one, [t]he same transaction . . . may constitute separate and distinct crimes where it is susceptible of separation into parts, each of which constitutes a completed offense. . . . [T]he test is not whether the criminal intent is one and the same and inspiring the whole transaction, but whether separate acts have been committed with the requisite criminal intent and are such as are made punishable by the [statute]. . . . When determining whether two charges arose from the same act or transaction, our Supreme Court has asked whether a jury reasonably could have found a separate factual basis for each offense charged." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Jarmon*, supra, 195 Conn. App. 284; see also *State* v. *Jerrell R.*, 187 Conn. App. 537, 545, 202 A.3d 1044, cert. denied, 331 Conn. 918, 204 A.3d 1160 (2019).

Our Supreme Court recently addressed step one of the double jeopardy analysis in *State* v. *Porter*, supra,

328 Conn. 648. Specifically, it considered "whether a court may look to the evidence presented at trial when determining if a defendant's conviction violated the constitutional prohibition against double jeopardy." Id., 650. In *Porter*, the defendant had argued that this court improperly considered the evidence presented at trial in determining whether a double jeopardy violation had occurred; the state countered that consideration of the evidence during step one was proper. Id., 650–51.

Briefly addressing step two of the double jeopardy analysis, our Supreme Court emphasized that "the *Blockburger* test . . . is a technical one and examines only the statutes, charging instruments, and bill of particulars as opposed to the evidence presented at trial." (Internal quotation marks omitted.) Id., 656. Our Supreme Court, after reviewing the relevant case law, noted that this prohibition against the review of the evidence applied only to step two of the double jeopardy analysis. Id., 658. With respect to step one, it emphasized that that it routinely had "looked beyond the charging documents [and considered the evidence] to determine whether the offenses arose from a single act or transaction." Id., 659. Further, it explicitly stated that, "[a]t step one, it is not uncommon that we look to the evidence at trial and to the state's theory of the case . . . ." (Internal quotation marks omitted.) Id., 662. Thus, in the present case, we must consider the charging documents, the evidence set forth during the trial, the state's theory of the case and the court's jury instructions, to determine whether the offenses of manslaughter in the first degree and risk of injury arose from the same act or transaction.

As we have noted previously, the state charged the defendant in a long form information, dated November 24, 1997, with capital felony and risk of injury. The state alleged that both of these crimes occurred "on or about the morning of December 8, 1996 . . . ." Additionally, the state asserted that these crimes occurred at the same location and were perpetrated on the same victim.

During the trial, the state presented the testimony of Arkady Katsnelson, an associate medical examiner who had performed the autopsy on the victim. During his external examination, Katsnelson noted multiples contusions, or bruises, on the victim's face and chest, and contusions and abrasions on the abdomen, arms, legs and back of the body.[10] There was no evidence that these injuries had begun to heal. Katsnelson opined, to a reasonable degree of medical certainty, that these wounds were recent and had occurred not long before the death of the victim.

Katsnelson also discovered multiple areas of hemorrhage under the skin of the scalp and noted that these separate injuries were located on the right side and the back of the victim's head. He described these wounds as "fresh" and that they had occurred not long before

death. As he continued the internal examination, Katsnelson discovered a substantial amount of the victim's blood in his abdominal cavity where there should be none, as well as a fractured rib and a "big laceration of the liver." The blood in the victim's abdominal cavity remained in a liquid state. Katsnelson noted the absence of any clotting, which indicated that the victim had not survived long after receiving the liver injury. Katsnelson further determined that the laceration to the liver was the cause of death[11] and that the victim's other injuries were not fatal. Katsnelson concluded that the victim could have survived only "a short period of time, which could be several minutes after he received the laceration of the liver."

The prosecutor asked Katsnelson if there was any indication that any of the injuries sustained by the victim had occurred at a different time, and he replied: "No, *all these injuries I found during my examination, I believe they [were] inflicted in the same short period of time*. They are not—I did not find any evidence of healing of these injuries, and I believe they were all inflicted within one short period of time." (Emphasis added.) He then defined "a short period time" as "within probably minutes."

The prosecutor also called as a witness Betty Spivack, a physician trained in pediatric critical care. She indicated that bruising does not occur when an individual is in severe shock or cardiac arrest due to the fact that, in such circumstances, blood is not being pumped through the body and does not flow out of the blood vessels. Spivack agreed that the injury to the victim's liver was the sole cause of cardiac arrest[12] in this case. She classified the victim's injuries into two groups: those that had occurred before, or no more than one to two minutes after, the liver laceration, and those that had happened after the liver laceration and resulting diminished blood flow to the skin, shock and cardiac arrest. Spivack testified that all of the bruises had occurred in the first group. She further stated that the only injures that had occurred in the second group were the three curved abrasions to the victim's left groin, and fractures to the front teeth, a very common resuscitation injury.

After the conclusion of the evidence, the prosecutor presented her closing argument to the jury. In reference to Katsnelson's testimony, the prosecutor referred to the victim's injuries to the head, face, chest, abdomen, back, groin, leg and arm. The prosecutor specifically argued: "*All of those were inflicted* [Katsnelson] said *in the same short period of time, a matter of minutes*. All the injuries were recent fresh injuries." (Emphasis added.) After discussing Spivak's testimony, the prosecutor indicated to the jury that "[a]ll the bruises and particularly the larger ones on the face, the back, the upper abdomen preceded the liver laceration or were

within two minutes of it according to the medical testimony." In addressing the intent element for the charge of capital felony, the prosecutor stated: "We've got— besides that blow [that caused the liver laceration] we've got the multiplicity and the nature of the injuries. There were repeated blows. There's only one fatal one. *This child was battered over and over and over again. We have the forceful upward kick or punch which lacerated the liver, caused internal bleeding and shock within three minutes and death not long after that, but there were many blows. The remainder of the injuries were inflicted in the same short period of time.* That's what the medical evidence is, multiple blows to the top of the head, the back of the head, the side of the head, the face, the chest, the abdomen, multiple puncture wounds to the groin, bruises to the leg and arm. . . . Finally, I would submit you may find evidence of the defendant's intent to kill in the fact that he didn't stop hitting [the victim] until he killed him." (Emphasis added.) The prosecutor ended her initial closing argument with the following statement: "There's only one logical conclusion, that *it was the defendant who killed* [*the victim*] *by striking him many times and continuing to strike him until he killed him* with some object or a punch or a kick with extensive force in the abdomen." (Emphasis added.)

After considering the long form information, the evidence presented at the criminal trial and the state's theory of the case, as evidenced by its closing argument, we conclude that the court erred in determining that the manslaughter in the first degree and the risk of injury offenses did not arise from the same act or transaction.

We note that our Supreme Court has held that where an information, as amplified by a bill of particulars,[13] charged a defendant with two narcotics offenses that had occurred at the same time and same place and involved the same narcotic, then those offenses arose from the same act or transaction. See *State* v. *Goldson*, supra, 178 Conn. 424–25; see also *State* v. *Nelson*, 118 Conn. App. 831, 853, 986 A.2d 311 (two kidnapping charges arose from same act or transaction where operative information alleged that crimes were committed on same date, in same location and against same victim), cert. denied, 295 Conn. 911, 989 A.2d 1074 (2010); *State* v. *Crudup*, 81 Conn. App. 248, 252–53, 838 A.2d 1053 (first prong of double jeopardy analysis met where information charged that both crimes occurred during afternoon hours of same date), cert. denied, 268 Conn. 913, 845 A.2d 415 (2004); *State* v. *Davis*, 13 Conn. App. 667, 671, 539 A.2d 150 (1988) (three offenses arose from same act or transaction where information alleged that all occurred at same time, date and location); cf. *State* v. *Miranda*, supra, 260 Conn. 120–24 (where defendant was charged with two counts of assault in first degree during same four month time period with one count

charging skull fracture and other rectal tears as serious physical injury, two offenses did not arise from same transaction where medical examination revealed that rectal tearing was "fresh" wound and skull fracture was seven to ten days old).

Additionally, the evidence produced at trial supports the conclusion that the injuries to the victim occurred during the same act or transaction. See *State* v. *Nixon*, 92 Conn. App. 586, 591, 886 A.2d 475 (2005). The medical evidence introduced by the state indicated that the victim's abrasions and contusions occurred in the period of time just prior to death and there was no indication of any healing. Specifically, Katsnelson identified the bruises under the scalp and the lack of clotted blood in the abdominal cavity as indicators that the victim had not survived long after receiving these injuries. He also testified that death occurred not long after the liver laceration. Indeed, he specifically stated that "all [of] these injuries which I found during my examination, *I believe they [were] inflicted in the same short period of time. They are not—I did not find any evidence of healing of these injuries, and I believe they were all inflicted within one short period of time . . . [and] I mean within probably minutes*." (Emphasis added.)

Finally, we consider the state's closing argument to the jury and its theory of the case. The prosecutor contended that Katsnelson had testified that the bruises and abrasions found on the victim's body were "fresh" injuries and had been inflicted "in the same short period of time, a matter of minutes." She further argued that the defendant had inflicted multiple blows to the head, chest and abdomen of the victim. The prosecutor subsequently emphasized the multiple blows that had occurred in a short period of time. The state relied on this evidence as proof of the defendant's intent to kill the victim. The fact that the jury did not find such intent does not change the fact that the state relied on all of the blows to the victim as showing how the defendant acted in a single, continuous attack. Defense counsel, during his closing argument, commented on the state's insistence that all of the victim's injuries had occurred "within a short period of time, all happened at once . . . ." After considering the state's closing argument; see *State* v. *Porter*, supra, 328 Conn. 663; as well as the information and the evidence presented,[14] we conclude that the homicide and risk of injury offenses in this case arose from the same transaction.[15] Accordingly, we proceed to step two of the double jeopardy analysis.

Step two of the double jeopardy analysis involves the determination of whether the homicide and risk of injury offenses constituted the same offense. We begin our analysis with our recent decision in *State* v. *Bumgarner-Ramos*, supra, 187 Conn. App. 725, in which we addressed the defendant's claim that his conviction of manslaughter in the first degree and assault in the first

degree violated the constitutional guarantee against double jeopardy. In resolving this issue, we set forth the applicable test. "At step two, we [t]raditionally . . . have applied the *Blockburger* test to determine whether two statutes criminalize the same offense, thus placing a defendant prosecuted under both statutes in double jeopardy: [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not. . . . *The test used to determine whether one crime is a lesser offense included within another crime is whether it is not possible to commit the greater offense, in the manner described in the information . . . without having first committed the lesser . . . . This . . . test is satisfied if the lesser offense does not require any element which is not needed to commit the greater offense. . . . Therefore, a lesser included offense of a greater offense exists if a finding of guilt of the greater offense necessarily involves a finding of guilt of the lesser offense.*" (Citation omitted; emphasis added; internal quotation marks omitted.) Id., 748; see generally *State* v. *Brown*, 163 Conn. 52, 61–62, 301 A.2d 547 (1972).[16] During this step of the double jeopardy analysis, we consider only the statutes, charging documents and any bill of particulars, rather than the evidence presented at trial.[17] *State* v. *Bumgarner-Ramos*, supra, 749.

In the present case, the defendant was convicted of manslaughter in the first degree and risk of injury to a child. Each of those criminal statutes contains an element the other does not: Manslaughter in the first degree provides that the offender cause the death of the victim and risk of injury to a child provides that the victim be under the age of sixteen years old. The defendant contends, however, that one cannot cause the death of another in the manner described in the information, without first inflicting trauma to the victim's body, which is an act likely to impair the health of the minor victim. Accordingly, he maintains that, under the circumstances of this case, risk of injury to a child is a lesser included offense and, thus, the same offense for purposes of double jeopardy, as manslaughter in the first degree. We agree with the defendant.

As we have recited previously, the state charged the defendant with causing the death of the fifteen month old victim by blunt trauma to the abdomen. With respect to the risk of injury count, the state alleged that the defendant impaired the health of the fifteen month old victim by inflicting multiple blows to the victim's face, head, chest and abdomen, and that he caused the laceration of the victim's liver, internal bleeding in the victim's abdomen, a fracture to the victim's rib and multiple contusions of the face, head, chest and abdomen. Focusing our analysis on the theoretical possibilities,

rather than the evidence, we cannot discern a scenario in which the defendant could have caused the death of the fifteen month old victim by blunt trauma to the abdomen without also impairing the health of the victim by inflicting trauma to his abdomen. Stated differently, it was not possible for the defendant to commit the homicide offense, in the manner described in the information, without first having committed risk of injury to a child. See *State* v. *Crudup*, supra, 81 Conn. App. 253; see, e.g., *State* v. *Amaral*, 179 Conn. 239, 243, 425 A.2d 1293 (1979) (defendant could not commit greater offense of possession of heroin with intent to sell by person who is not drug-dependent without, at same time, committing lesser offenses of possession of heroin with intent to sell and simple possession of heroin); *State* v. *Goldson*, supra, 178 Conn. 427 (violation of double jeopardy where defendant convicted of transportation of heroin and possession of heroin); *State* v. *Bumgarner-Ramos*, supra, 187 Conn. App. 749–51 (concluding that defendant's conviction of both assault in first degree and manslaughter in first degree violated constitutional guarantee against double jeopardy because defendant could not have caused victim's death in manner charged without first having caused victim serious physical injury); *State* v. *Arokium*, 143 Conn. App. 419, 434–35, 71 A.3d 569 (violation of double jeopardy where defendant convicted of greater offense of possession of narcotics with intent to sell and lesser included offense of possession of narcotics), cert. denied, 310 Conn. 904, 75 A.3d 31 (2013); *State* v. *Cooke*, 42 Conn. App. 790, 802–803, 682 A.2d 513 (1996) (because elements of forgery in third degree must be proven before defendant can be convicted of forgery in second degree, it is lesser included offense, and conviction of both violated double jeopardy clause); *State* v. *Flynn*, supra, 14 Conn. App. 19 (theoretically impossible to have situation where defendant, with intent to prevent performance of duties of peace officer, either causes physical injury to officer or throws or hurls bottle or other object at officer capable of causing harm without at same time obstructing, hindering, resisting or endangering that officer in performance of his duties).

In light of the cases cited herein, the defendant has demonstrated that the homicide and risk of injury offenses arose from the same act or transaction and that the risk of injury offense is a lesser included offense within the homicide offense, as charged in the information in this case.

Finally, we must consider whether the defendant's right to be free from double jeopardy was not violated because our legislature authorized multiple punishments. "Where . . . a legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the same conduct under *Blockburger*, a court's task of statutory construction is at an end and the prosecutor may

seek and the trial court or jury may impose cumulative punishment under such statutes in a single trial." (Internal quotation marks omitted.) *State* v. *Gonzalez*, 302 Conn. 287, 317, 25 A.3d 648 (2011). However, "[w]here there is no clear indication of a contrary legislative intent . . . the *Blockburger* presumption controls." (Internal quotation marks omitted.) *State* v. *Bumgarner-Ramos*, supra, 187 Conn. App. 751 n.19. In his memorandum of law in support of his motion to correct an illegal sentence, the defendant argued that there was no such intent evidenced by our legislature that would permit multiple punishments in this case. In his appellate brief, the defendant iterated this argument. This state has not provided this court with any authority that our legislature authorized separate penalties for the defendant's criminal offenses. In the absence of any such authority that would support such a conclusion, we defer to the *Blockburger* presumption and conclude that, in this case, the defendant's punishment cannot withstand constitutional scrutiny. Id.; see also *State* v. *Flynn*, supra, 14 Conn. App. 19 ("[u]nless a clear intention to fix separate penalties for each [offense] involved is expressed, the issue should be resolved in favor of lenity and against turning a single transaction into multiple offenses" (internal quotation marks omitted)).

We conclude that the defendant's right to be free of double jeopardy was violated in this case. Accordingly, the trial court improperly denied his motion to correct an illegal sentence.

The judgment is reversed and the case is remanded for further proceedings in accordance with this opinion.

In this opinion the other judges concurred.

[1] General Statutes § 53a-55 (a) provides in relevant part: "A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person or of a third person . . . ."

[2] General Statutes (Rev. to 1995) § 53-21, as amended by No. 95-142 of the 1995 Public Acts, provides in relevant part: "Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child . . . shall be guilty of a class C felony." All references to § 53-21 in this opinion are to the 1995 revision of the statute as amended by No. 95-142 of the 1995 Public Acts.

[3] General Statutes (Rev. to 1995) § 53a-54b, as amended by No. 95-16 of the 1995 Public Acts, provides in relevant part: "A person is guilty of a capital felony who is convicted of . . . (9) murder of a person under sixteen years of age." All references to § 53a-54b in this opinion are to the 1995 version of the statute, as amended by No. 95-16 of the 1995 Public Acts.

General Statutes § 53a-54a provides in relevant part that "[a] person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

[4] The court also had instructed the jury on manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (3), manslaughter in the second degree in violation of General Statutes § 53a-56 and criminally negligent homicide in violation of General Statutes § 53a-58.

[5] Practice Book § 43-22 provides: "The judicial authority may at any time correct an illegal sentence or other illegal disposition, or it may correct a sentence imposed in an illegal manner or any other disposition made in an illegal manner."

[6] In *State* v. *Porter*, supra, 328 Conn. 661–62, our Supreme Court expressly held that a reviewing court may consider the evidence and the state's theory of the case, along with the information, as amplified by a bill of particulars, in determining whether two charges arose from the same act or transaction.

[7] The fifth amendment to the United States constitution provides in relevant part: "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb . . . ." The fifth amendment is applicable to the states through the fourteenth amendment's due process clause. See *State* v. *Brown*, 299 Conn. 640, 651, 11 A.3d 663 (2011). "Although the Connecticut constitution does not include a specific double jeopardy provision, we have held that the due process and personal liberty guarantees provided by article first, §§ 8 and 9, of the Connecticut constitution . . . encompass the protection against double jeopardy. . . . The protection afforded against double jeopardy under the Connecticut constitution mirrors, rather than exceeds, that which is provided by the constitution of the United States." (Footnotes omitted; internal quotation marks omitted.) Id.; see also *State* v. *Ferguson*, 260 Conn. 339, 360, 796 A.2d 1118 (2002).

[8] Specifically, the court instructed the jury as follows: "For purposes of the record, § 53a-55 (a) (1) insofar as it is pertinent in this case provides as follows: A person is guilty of manslaughter in the first degree when with intent to cause serious physical injury to another person he causes the death of such person. For you to find the defendant guilty of this charge the state must prove the following elements beyond a reasonable doubt: First, that the defendant caused the death of [the victim] and second that the defendant intended to cause serious physical injury to [the victim].

"The term serious physical injury means a physical injury that creates a substantial risk of death or that causes serious disfigurement, serious impairment of health or serious loss and impairment of the function of bodily organs. You will note that the basis of the charge under this statute is not that the defendant intended to kill but that he intended to inflict serious physical injury."

[9] See footnote 4 of this opinion.

[10] Katsnelson explained that a contusion or bruise "is an injury which is inflicted with a blunt object, and usually, a bruise, it is an accumulation of blood under the skin. When some kind of a hard object, a blunt object hit the skin, there are vessels—blood vessels under the skin, and the blood vessels will rupture due to the trauma, and they will bleed under the skin, and the skin will appear bruised." He also defined an "abrasion" as scraping of the upper layer of skin.

[11] Katsnelson later explained that the laceration to the liver resulted from blunt trauma and caused extensive bleeding into the abdominal cavity, resulting in the victim's death.

[12] Spivack also opined that the injury to the victim's liver resulted from either an uppercut type punch to the upper part of the belly, or an upward kick, as opposed to a stomp. She also indicated that after the laceration to the liver, the victim initially would have lost 80 to 100 cubic centimeters of blood per minute into the abdominal cavity and gone into shock within two to four minutes. While the rate of blood loss would have slowed down, cardiac arrest would occur a few minutes thereafter. Spivack defined cardiac arrest as "the situation when the heart no longer pumps, when there is no pulse. If you were feeling for a pulse, you wouldn't find one. If you were listening, you wouldn't hear one. . . . The heart has ceased to pump and is still."

[13] The defendant did not file a motion for a bill of particulars in this case.

[14] We note that the state acknowledged that the evidence and theory of the case advanced by the trial prosecutor indicated that the two offenses arose from the same act or transaction. Specifically, the state argued the following in its June 11, 2018 opposition to the defendant's motion to reargue and/or for reconsideration: "*The state does not challenge that the injuries that formed the basis of both the capital felony charge/manslaughter in the first degree conviction and the risk of injury count happened in the same transaction. In fact, it appears that was the trial prosecutor's theory of the case.* However, as this court noted in its ruling, the types of prohibited acts here formed the basis for the two distinct charges. That is to say, there were clearly acts alleged in the risk of injury count, attributed to the defendant, that could not have possibly formed the basis of the injuries which led to the child's death and, therefore, could not have formed the basis of the homicide charge." (Emphasis added.)

[15] We also note that the court's instructions to the jury did not exclude the fatal blow to the victim's abdomen from the jury's consideration of the

risk of injury charge. See *State* v. *Benjamin*, 86 Conn. App. 344, 352, 861 A.2d 524 (2004). The absence of such a limitation permitted the jury to find the defendant guilty of both the risk of injury and the homicide charges on the basis of the fatal blow to the abdomen that resulted in the lacerated liver. See id.

[16] In view of this controlling precedent, we decline to adopt the reasoning of the trial court, as set forth in its May 15, 2018 decision, that the phrase "in the manner described in the information" modifies both the greater and the lesser included offense.

[17] We iterate that the defendant did not file a motion for a bill of particulars in this case. See footnote 13 of this opinion.